**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 15 2013, 8:59 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**HAROLD E. AMSTUTZ**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
Department of Child Services,
Tippecanoe County Office
Lafayette, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF J.B., MINOR CHILD, AND HER MOTHER, A.B., | ) ) ) ) ) | |
| A.B., | ) ) | |
|     Appellant-Respondent, | ) ) | |
|         vs. | ) ) | No. 79A02-1209-JT-764 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
|     Appellee-Petitioner. | ) ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas K. Milligan, Senior Judge
Cause No. 79D03-1205-JT-59

**March 15, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Respondent A.B. ("Mother") appeals the juvenile court's order terminating her parental rights to J.B. J.B. was removed from Mother's care after the Department of Child Services ("DCS") received multiple reports of Mother's erratic and unstable behavior. Mother contends that the trial court erroneously based its decision to terminate her parental rights to J.B. solely on Mother's mental health issues. Alternatively, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. Concluding that the juvenile court did not base its decision to terminate Mother's parental rights solely on Mother's mental health issues and that the evidence was sufficient to support the termination of Mother's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

J.B. was born to Mother and M.N. ("Father") on June 6, 2011. DCS became involved with the family after receiving a report on June 6, 2011, that Mother and Father were unable to meet J.B.'s basic needs because of certain mental health issues.[1] After receiving this report, a DCS assessor met with Mother who acknowledged "that she was diagnosed with bipolar, depression, OD with psychosis, and borderline personality disorder." DCS Ex. 2, p. 1. Mother executed a safety plan in which she agreed to seek mental health treatment within seven days.

---

[1] The termination of Father's parental rights is not at issue in this appeal. As such, we will include facts pertaining to Father only to the extent that they are relevant to the termination of Mother's parental rights.

On July 9, 2011, DCS received a second report indicating that Mother had significant untreated mental health issues that caused her to struggle with stability and affected her ability to provide for J.B.'s basic needs. After receiving this second report, the DCS assessor again met with Mother on July 14, 2011. At the time, Mother was temporarily living with maternal grandmother. Mother indicated that she and J.B. had recently moved out of Mother's most recent boyfriend's residence because the boyfriend was abusive. The DCS assessor determined that despite Mother's prior agreement with DCS, as set forth in the safety plan, Mother had not yet sought mental health treatment. Mother also acknowledged that she had missed one of J.B.'s scheduled doctor's appointments because "she forgot." DCS Ex. 2, p. 2. The DCS assessor stressed the importance of J.B. attending her doctor's appointments to Mother.

On August 2, 2011, the DCS assessor visited Mother and J.B. at maternal grandmother's home. When the DCS assessor was met at the door by Mother, Mother was carrying J.B. who was wearing only a diaper. Mother granted the DCS assessor permission to enter the home. Upon entering the home, the DCS assessor observed trash on the living room floor, a large trash bag in the living room that had trash "spilling out of it," end tables "covered in empty drink containers," and "ash trays spilling over with cigarette butts." DCS Ex. 2, p. 2. The kitchen was overflowing with trash and dirty dishes, and two previously unidentified adults were in Mother's bedroom. The DCS assessor also observed that the baby bed and the "pack and play" were not set up, and Mother told the DCS assessor that J.B. slept in her "bouncy seat." DCS Ex. 2, p. 2. Mother also told the DCS assessor that J.B. had

recently been sick, had an allergic reaction to the formula that she was being fed, and had been placed on a diet of soy formula. In addition, Mother indicated that she had not yet received any treatment for her mental health issues. The DCS assessor shared her concerns about the condition of the home and the fact that J.B.'s baby bed was not set up, and instructed Mother to "start cleaning" the home. DCS Ex. 2, p. 2. The DCS assessor indicated that she would return the next day to check on Mother's progress.

On August 3, 2011, Mother left a message for the DCS assessor indicating that "she would not be home and that she was not trying to avoid [DCS]." DCS Ex. 2, p. 2. The DCS assessor then contacted a representative of the Riggs Community Health Clinic (the "Clinic"), who informed the DCS assessor that the Clinic did not have any records of J.B. being treated at the hospital and that Mother and J.B. were "no show[s]" for J.B.'s last scheduled appointment. DCS Ex. 2, p. 2. The representative for the Clinic also informed the DCS assessor that after receiving a phone call from Mother indicating that J.B. continued to spit up the soy formula, Clinic representatives suggested that Mother was over-feeding J.B. Mother, however, did not want to take any suggestions regarding feeding J.B. from the Clinic representatives, became upset, and hung up on the Clinic representative. The Clinic representative shared the concern that Mother was struggling with what to do when J.B. cried. The DCS assessor subsequently confirmed that Mother and J.B. did not show for J.B.'s scheduled appointment that morning.

After speaking to the Clinic representative, the DCS assessor, along with representatives from the Lafayette Police Department, went to maternal grandmother's

4

residence. Upon arriving at the residence, the DCS assessor determined that Mother was not home and that Mother had left J.B. with maternal grandmother. The DCS assessor found that J.B. was dressed only in a soiled diaper, had dried formula in the creases of her neck, and the skin around J.B.'s neck was irritated and looked infected on one side. J.B. was taken into protective custody at that time.

A few days later, on or about August 5, 2011, DCS filed a verified petition alleging that J.B. was a child in need of services ("CHINS"). On October 3, 2011, following a fact-finding hearing, the juvenile court found J.B. to be a CHINS. The juvenile court issued a dispositional order and parental participation decree on October 25, 2011, in which it ordered Mother to complete certain services. Mother, however, did not complete all of these services.

On May 21, 2012, DCS filed a petition seeking the termination of Mother's parental rights to J.B. On August 6, 2012, and September 6, 2012, the juvenile court conducted an evidentiary termination hearing at which Mother appeared and was represented by counsel. During the termination hearing, DCS introduced evidence relating to Mother's failure to seek treatment for her mental health issues, Mother's inability or refusal to properly care for J.B., and Mother's failure to participate in or benefit from the services offered by DCS. DCS also introduced evidence indicating that termination of Mother's parental rights was in J.B.'s best interests, and that its plan for the permanent care and treatment of J.B. was adoption. Mother presented evidence which she claimed demonstrated that she was beginning to make progress and, as such, should be given more time before her parental rights were terminated.

5

Following the conclusion of the termination hearing, the juvenile court terminated Mother's parental rights to J.B. Mother now appeals.

## DISCUSSION AND DECISION

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

### I. Mental Capacity as Grounds for Termination

Mother contends that juvenile court erred "in terminating [her] parental rights based on her mental health issues." Appellant's Br. p. 6. The Indiana Supreme Court has held that mental health issues of the parent, standing alone, are not a proper grounds for terminating

6

parental rights. *Egly v. Blackford Cnty. Dep't. of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992) (internal citations omitted). "Where, however, the parents are incapable of or unwilling to fulfill their legal obligations in caring for their children, then mental illness may be considered." *Id*. (internal citations omitted).

Here, the record reveals that the juvenile court did not base its decision to terminate Mother's parental rights to J.B. solely on Mother's mental health issues. Rather, the record demonstrates that the juvenile court considered Mother's mental illness to the extent that it affected her willingness and ability to fulfill her legal obligations in caring for J.B. The juvenile court did not err in this regard.

## II. Sufficiency of the Evidence

Alternatively, Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

In deference to the juvenile court's unique position to assess the evidence, we set

7

aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
(B) that one (1) of the following is true:
(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Specifically, Mother claims that DCS failed to establish that either (1) the conditions that resulted in J.B.'s removal or the reasons for J.B.'s

8

placement outside of her care will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of J.B. Mother also claims that DCS failed to establish that termination of her parental rights was in J.B.'s best interests.

## A. Conditions Resulting in Removal Not Likely to be Remedied

On appeal, Mother argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in J.B.'s removal from her care will not be remedied and that the continuation of the parent-child relationship poses a threat to J.B. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find *either* that the conditions resulting in removal will not be remedied *or* that the continuation of the parent-child relationship poses a threat to J.B. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, "where, as here, the [juvenile] court specifically finds that there is a reasonable probability that the conditions which resulted in the removal of the [child] would not be remedied, and there is sufficient evidence in the record supporting the [juvenile] court's conclusion, it is not necessary for [DCS] to prove or for the [juvenile] court to find that the continuation of the parent-child relationship poses a threat to the [child]." *In re S.P.H.*, 806 N.E.2d at 882.

In order to determine that the conditions will not be remedied, the juvenile court should first determine what conditions led DCS to place J.B. outside of Mother's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *Id.* When assessing whether a reasonable probability exists that the conditions justifying a

9

child's removal and continued placement outside her parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id*. (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).

Here, the juvenile court determined that DCS presented sufficient evidence to prove that the conditions that resulted in J.B.'s removal from Mother's care were not likely to be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination that there is a reasonable probability that the conditions which resulted in J.B.'s removal from Mother's care will not be remedied, the juvenile court made a number of findings which Mother now claims are clearly erroneous.

The juvenile court made the following findings in support of its determination that there was a reasonable probability that the conditions which resulted in J.B.'s removal from Mother's care would not be remedied:

10

[Mother] has been diagnosed with Attention Deficit/Hyperactivity Disorder, Combined type (provisional) and Personality Disorder Not Otherwise Specified (Mixed Personality Disorder with Borderline, Paranoid, and Negativistic Traits). The testing suggests that she is erratically moody and emotionally labile disposed to fluctuating symptoms of depression and anxiety. Furthermore she is guarded, suspicious, angry, resentful, rebellious, impulsive, and irresponsible. Her testimony in court in this hearing revealed some of these traits, not only in what she said but in how she said it. In particular she tried to excuse not participating in services by blaming her not participating on service providers and the DCS caseworkers themselves.

The issues to be worked on with [Mother] as identified by [DCS] and the service providers included mental health issues, employment, housing and parenting. She also visited with [J.B.] she displayed a lack of understanding of appropriate interaction with an infant by trying to talk to [J.B.] and change [J.B.]'s behavior through talk or reason. She did not, and does not, understand ordinary child development milestones and how to appropriately interact with a child at different levels of development. During the visits she has been redirected in her dealing with the child. Sometimes she accepts the redirection and other times she does not. One of the difficult features of working with [Mother] is her wanting to do things herself, she resists help or guidance more often than not. While she verbalizes that she wants services and assistance, when offered or suggested she often becomes defensive and resistant.

She is seen as disorganized. She says she doesn't need services. She thinks she can do it on her own. She lives a chaotic lifestyle. Services were begun including visitation, employment, and housing. Services were terminated after one week in February 2012 for her failure to cooperate. Services were reinstituted and she has participated off and on. Between March and June there were 41 opportunities to visit with the child. [Mother] visited 25 times. There were very few times the visits were cancelled because the child was ill. The other times were cancelled by [Mother]. When she did visit she would do well on what was a good day for her, but if she was having a bad day the visits did not go well. Often she was easily distracted by her cell phone and often had to be redirected.

She would not work on her issues in therapy. She gave a variety of excuses: It is too expensive for me. I had a bad experience there. I do not want to talk about things from the past. She was very resistant to any sort of mental health intervention.

11

Housing was an issue. She lived in four or five locations since [DCS's] involvement, most recently with her father in a one bedroom apartment. She has not lived on her own. She has always lived with a relative, a boyfriend or some other adult. She could not live on her own for a long term without some sort of support or assistance.

Employment was an issue. [Mother] did obtain employment at Steak and Shake, a B-P gas station and most recently at Subway. None of the jobs have been sufficient to allow her to completely support herself. She draws $200 per month in food stamps. None of the jobs have lasted very long except, perhaps, for the Subway job. She is on maternity leave from that job and it is an open question whether she will go back after her leave is up or whether they will take her back.

The court finds that because of [Mother]'s mental health diagnosis and her refusal to address the issues raised by that evaluation, her demonstrated behavioral problems including her consistent inconsistency, and her refusal to address all the related issues that she is unable to parent [J.B.] on a full time basis. For the child to be safe and well cared for [Mother] would need the help of a responsible adult from whom she would be willing and able to accept direction and guidance. Her limitations, especially the personality disorder, her not understanding the child developmental milestones, and unrealistic expectations of the child render her unable to adequately provide for the child's medical care, education and supervision.

Appellant's App. pp. 8-9.

In challenging the juvenile court's findings, Mother argues that the juvenile court's findings are erroneous because the findings "did not consider or recite the positive information about [Mother], the progress she had made, or her status at the time of the [termination] hearing" and failed to explain how Mother was unfit to care for J.B. Appellant's Br. p. 13. Specifically, Mother claims that neither her inability to "completely support[] herself" nor her inability to obtain and maintain stable housing demonstrates that she is unfit to care for J.B. Mother also claims that she could not afford the counseling, case management, and medication management ordered by the juvenile court.

12

Upon review, we conclude that each of the juvenile court's above-stated findings is supported by the evidence. The evidence establishes that Mother was offered a variety of services at little or no cost, including therapy, mental health treatment, and anger management and parenting classes, as well as assistance obtaining employment, Medicaid benefits, and suitable housing. Mother was also given the opportunity to engage in visits with J.B. on a regular basis. While Mother initially appeared receptive to these services, she eventually began resisting and refusing services.

The record reveals that Mother refused to participate in mental health services as ordered by the juvenile court. Specifically, Mother was resistant to or flat out refused to participate in therapy and individual counseling. Mother acknowledged that she would likely benefit from taking medication, but refused to participate in medication management. Mother blamed her failure to participate in these services on cost and the service providers. Mother also failed to cooperate and take advantage of the assistance that was offered with respect to helping her obtain Medicaid.

Mother also failed to participate in anger management classes. Mother's anger management issues often revealed themselves during visitation sessions and meetings with case workers when the case workers would attempt to redirect Mother's behavior or recommend services. On one occasion, Mother became belligerent when speaking to visitation supervisor Jeannie Bresnahan, DCS case manager Jackie Burns, and court-appointed special advocate ("CASA") Sharon Cornell about services. Mother began yelling, "jiggling" J.B., screaming, cursing, and using a substantial amount of profanity. Tr. p. 127.

13

On another occasion, visitation supervisor Melissa Kalbaugh testified that she became scared when Mother began acting "very belligerent with [J.B.] in her arms, stood up, pounded [her] fist on the table." Tr. p. 9. On this occasion, Mother was "screaming, standing up, leaning over the table, pounding her fist with [J.B.] in her arm. [J.B.] was being jiggled around." Tr. p. 10. Mother also became belligerent and began cursing and yelling after being told that certain individuals had not been approved by DCS to attend J.B.'s first birthday party.

The record further reveals that Mother failed to complete parenting classes, including a class focused on developmental milestones. Throughout the CHINS and termination proceedings, Mother continued to demonstrate a lack of understanding of appropriate behavioral expectations for an infant, even going as far as calling J.B. "lazy" when J.B. did not meet Mother's unrealistic expectations. Tr. p. 11. Mother also failed to attend a substantial number of scheduled visits with J.B. Between the months of August 2011 and January 2012, Mother missed what Bresnahan described as an "extensive" number of visits and Mother was discharged from services because of these missed visits. Tr. p. 123. Mother continued to miss visitation session even after services were reinstated. Mother was granted visitation and offered services through a different service provider beginning in February 2012. During the next six months, Mother attended only twenty-five of forty-one scheduled visits. Mother often claimed to have missed visits because she was sick, but on at least two occasions, Mother was observed spending time with friends in public within hours of the canceled visits which, again, she claimed to be too sick to attend. Even when Mother would

14

attend visits, she would often need to be redirected by the visit supervisor and was easily distracted by her cellular phone.

Mother also failed to follow through on educational goals and was resistant to services aimed at helping her to obtain and maintain consistent employment. Mother obtained a job at a Steak 'n Shake restaurant but was fired after only two weeks for attendance issues. Mother later obtained part-time employment at a BP gas station, where she worked as a cashier a few days a week. Mother subsequently quit that job and was unemployed for a few months until she obtained employment at a Subway restaurant. At the time of the fact-finding hearing, Mother was on maternity leave from the Subway restaurant, and it is unclear from the record whether Mother will continue her employment after her leave ends.

Mother also failed to obtain and maintain suitable housing. During the pendency of the CHINS and termination proceedings, Mother resided in numerous residences with either family or friends. Mother resided at each of these residences for a period of no more than a few months. Mother persistently refused services aimed at helping Mother obtain long-term stable housing. At the time of the fact-finding hearing, Mother resided with maternal grandfather in a one-bedroom apartment. However, neither the service providers, DCS Case Manager Burns, nor CASA Cornell had been able to verify whether maternal grandfather's apartment was suitable for a child.

Mother had a mixed record with regard to participation in and success with the services offered by DCS and did not appear to be receptive to advice from service providers. While Bresnahan believes that Mother could potentially benefit from services if she were

15

willing to participate, Kalbaugh testified that Mother was the most challenging and uncooperative client she had ever worked with. The record reveals that Case Manager Burns testified that she did not believe that the issues which would need to be addressed before Mother could regain custody of J.B. could be addressed in a reasonable amount of time. In addition, CASA Cornell testified that she did not believe that the reasons for J.B.'s removal from Mother's care had been remedied or that the reasons would be remedied in the foreseeable future.

While it is undisputed that Mother loves J.B. and would never intentionally cause her harm, we conclude that the evidence, when considered as a whole, is sufficient to demonstrate a reasonable probability that the conditions which resulted in J.B.'s removal from Mother's care will not be remedied. It was within the province of the juvenile court, as the finder of fact, to minimize any contrary evidence of changed conditions in light of its determination that Mother's failure to provide a safe and stable living environment which led to J.B.'s removal was unlikely to change. *See In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*.

Furthermore, while the record indicates that the juvenile court considered the evidence presented by Mother in support of the progress that she claimed to be making, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25,

167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Mother's claim effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in J.B.'s removal would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to J.B.'s well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

### B. J.B.'s Best Interests

Next, we address Mother's claim that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in J.B.'s best interests. We are mindful that in determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id*. Furthermore, this court has previously determined that the testimony of the case worker or CASA regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id*.; see also *Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

17

In the instant matter, both Case Manager Burns and CASA Cornell testified that they believed that the termination of Mother's parental rights was in J.B.'s best interests. Specifically, CASA Cornell testified that she believed the termination of Mother's parental rights was in J.B.'s best interests because, "throughout the entire case [Mother] has repeatedly been inconsistent in her visitation, in her management; [she has] unstable housing, unstable employment; she has failed to address her mental health issues." Tr. p. 248. In addition, Mother has not

> shown or exhibited the understanding of developmental milestones for children; there's been some unrealistic expectations on Mother's part about what the child is able to do or not able to do given her age at that period of time. Mother's mental health was the reason that the child was removed and her behavior at the hospital after the child was born. She continues to exhibit the erratic behavior occasionally and the anger management and the mental health issues have neither one been addressed because she's refused to do therapy or not been consistent in attending therapy.

Tr. pp. 249-50. In addition, both Case Manager Burns and CASA Cornell expressed concerns about Mother's ongoing lack of stability.

The juvenile court did not have to wait until J.B. was irreversibly harmed such that her physical, mental, and social development was permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of Case Manager Burns and CASA Cornell, considered with Mother's refusal to seek treatment for her mental health issues, Mother's failure to accept assistance, and Mother's continued lack of stability, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Mother's parental rights is in J.B.'s best interests. Again, Mother's claim to the contrary merely amounts to an invitation for this court to reweigh the

18

evidence, which again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

Having concluded that the juvenile court did not base its decision to terminate Mother's parental rights solely on Mother's mental health issues and that evidence was sufficient to prove the statutory requirements set forth in Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.